Ex parte LIVINGSTON.

(Supreme Court, Appellate Division, Second Department. May 17, 1912.)

1. ADOPTION (§ 12*)—ABANDONMENT OF CHILD—PROCEEDINGS—NOTICE.

While Domestic Relations Law (Consol. Laws 1909, c. 14) §§ 110–118, regulating the method and effect of the adoption of children, does not require notice to be given to a nonconsenting parent claimed to have abandoned the child, the County Court cannot, without actual or constructive notice to the parent, determine that she has forfeited her natural rights to the custody of her child.

[Ed. Note.—For other cases, see Adoption, Cent. Dig. §§ 18–21; Dec. Dig. § 12.*]

2. ADOPTION (§ 1*).

The adoption of children was well known at Roman law, but did not exist at common law, and, as now applied, its basis is wholly statutory.

[Ed. Note.—For other cases, see Adoption, Cent. Dig. § 15;. Dec. Dig. § 1.*]

3. PARENT AND CHILD (§ 2*)—CUSTODY OF CHILD—PARENTS AND STATE.

The state cannot interfere with the right of natural parents to the custody of their children merely to better the moral and temporal welfare of the child as against an unoffending parent.

[Ed. Note.—For other cases, see Parent and Child, Cent. Dig. §§ 4–32; Dec. Dig. § 2.*]

Appeal from Special Term, Kings County.

Application of Myrtle Livingston for a writ of habeas corpus for John Joseph Livingston, an infant. From an order dismissing the writ (74 Misc. Rep. 494, 134 N. Y. Supp. 148), the petitioner appeals. Reversed and remitted for hearing and determination.

Argued before JENKS, P. J., and HIRSCHBERG, THOMAS, CARR, and WOODWARD, JJ.

Edward T. Curran, of Brooklyn, for appellant.

Charles H. McCarty, of New York City, for respondent.

CARR, J. This is an appeal from an order of the Special Term dismissing a writ of habeas corpus. The petitioner is the mother of a boy, born in lawful wedlock, who is now in the custody of the respondents. The father has disappeared for several years. On the return of a writ of habeas corpus sued out by the mother to recover possession of her child, the respondents filed a return, wherein they claimed the right to the custody of the child by virtue of an order of adoption made by the County Court in Kings county in December, 1911. The petitioner traversed this return by setting up that no notice, either actual or constructive, had been given to her of the proceeding, and that, therefore, as to her the order of adoption was a nullity. The learned court at Special Term held that this traverse did not raise a question of law which affected the validity of the order of adoption, and made an order dismissing the writ. The petitioner now appeals from said order.

[1] The provisions of our statutes regulating the method and effect of adoption of children are to be found in sections 110 to 118, inclusive, of our Domestic Relations Law.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

[2] At common law adoption of children as now understood did not exist, and as now applied its basis is entirely statutory. Matter of Thorne, 155 N. Y. 140, 49 N. E. 661. It was well known in Roman law, and the various statutes in this country which create and regulate the power of adoption find their original basis in Roman jurisprudence. Under that system of law, adoption could take place under certain conditions, not only of minor children, but of adults, while under our statutes it is confined to minor children. Under the Roman law, as to a minor child, no legal method of adoption was known without the consent of the person who had "patria potestas" over the child. Then the family was recognized as the unit of society, and family rights and duties were defined and regulated with precision. By our statute adoption cannot take place without the consent of the parents of the minor child, unless such parents have forfeited their natural rights to the custody of the child under circumstances clearly defined by the statute itself, and one of which is an abandonment of the child by the parents.

In this case the petitioner did not consent to the adoption of her child, but the court dispensed with such consent on an adjudication made by it that the petitioner had in fact abandoned the child. Our statute contains no express provision requiring the giving of notice to a nonconsenting parent who is claimed to have abandoned the child. The question arises whether such adjudication was within the jurisdiction of the County Court without actual or constructive notice to the parent. This question is without reported precedent in this state. The only authority which approaches it is that of Matter of MacRae, 189 N. Y. 142, 81 N. E. 956, 12 Ann. Cas. 505, but, as I shall show later on, it is not strictly in point here. In other jurisdictions the question has arisen in one form or other with considerable frequency.

In Van Matre v. Sankey, 148 Ill. 536, 36 N. E. 628, 23 L. R. A. 665, 39 Am. St. Rep. 196, a question arose as to the right of a child which had been adopted under the laws of Pennsylvania to share in the descent of lands of the foster parents located in the state of Illinois. The attack was based upon the ground that no notice had been given to the child who was about the age of nine years, both her parents being dead. It was held that the absence of notice to the child itself, it being of such tender years, was not fatal, inasmuch as both parents being dead the child was the ward of the state as "parens patriæ." The child, however, had a legal guardian who did consent.

An attempt was made in Re Williams, 102 Cal. 70, 36 Pac. 407, 41 Am. St. Rep. 163, to raise this precise question, and, while the court intimated that where a parent had abandoned his child notice to him of an adoption proceeding might not be necessary, it at the same time declared clearly that it did not consider that such question was before it for decision. There the question involved was the right of the adopted child to share in the estate of its foster parents. The natural parent did not attack the adoption, for he was dead. The court said:

"It is argued, however, by counsel for appellants that it is not in the power of the state to deprive a parent of the natural right to his child for such a cause [abandonment of the child], without at least affording him an opportunity to appear and answer the charge in the proceeding which is taken for the purpose of severing his parental relations. Whatever force there might be in this position in a case where the natural father of an adopted child was asserting his right to the custody of such child, or in an action brought by him to recover the value of its services from the adopted parent, it seems to us that the question thus argued by counsel does not arise here. The father of the respondent [the adopted child] is dead; but, if he were alive, no rights of his would be impaired by giving force and effect to the contract of adoption, and permitting respondent to succeed to the estate of the deceased as the adopted child of the latter."

In Matter of Gibson, 154 Mass. 378, 28 N. E. 296, the court declined to hold an adoption order void because of failure to give notice thereof to the father, but in that case it was held that as the child was illegitimate, and, as no order or judgment of affiliation had been made, the putative father was not a "parent" in the sense of the statute.

In Nugent v. Powell, 4 Wyo. 173, 33 Pac. 23, 20 L. R. A. 199, 62 Am. St. Rep. 17, there is an elaborate consideration of this question, and it is said there that notice is not essential to a parent who had abandoned his child. There the child had two living parents, the mother, who had consented to the adoption, and the father, who had abandoned it and had given no consent and received no notice. This case arose upon the distribution of the estate of the foster parent, and the validity of the adoption was challenged, not by the natural father, but by the next of kin of the deceased foster parent. It was held expressly that the adoption order was binding upon the parties to the proceeding and their privies, whether or not binding upon the natural father. In the opinion it is said quite forcibly that, in any event, notice to the natural father was not requisite to the validity of the adoption proceedings, and a train of argumentation is advanced to support this proposition. Whether a decision of this question was actually necessary for a decision of that case may well be doubted, and I do not consider the supplemental argumentation at all authoritative.

In Schiltz v. Roenitz, 86 Wis. 31, 56 N. W. 194, 21 L. R. A. 483, 39 Am. St. Rep. 873, approved in Parsons v. Parsons, 101 Wis. 76, 77 N. W. 147, 70 Am. St. Rep. 894, this question came up squarely for decision. There the natural father of a child sued an alleged foster parent for the value of the child's services. There had been an adoption proceeding of which the natural father had received no notice on the ground that he had abandoned the child. It was held that the adoption order was void as against the natural father. The court said on this point:

"The contention that the County Court could, without notice to the plaintiff or opportunity to him to defend against the charge of abandonment, grant an order depriving the plaintiff of his most sacred natural rights in respect to his child, so jealously guarded and protected by the laws, offends against all our ideas respecting the administration of justice, and is opposed to the principles which lie at the foundation of all judicial systems not essentially despotic in their character and methods of procedure. It is provided by the fourteenth amendment to the Constitution of the United States that 'no state

shall * * * deprive any person of life, liberty or property without due process of law.' Due process of law, as applied to judicial proceedings, includes a charge before some judicial tribunal, and notice to the party in some form, either actual or constructive, and an opportunity to appear and produce evidence in his defense and be heard by himself or counsel. To proceed to adjudicate in the absence of notice to the party 'would be contrary to the first principles of the social compact, and of the right of administration of justice.' McVeigh v. U. S., 11 Wall. 267 [20 L. Ed. 80]. In Windsor v. McVeigh, 93 U. S. 277, 23 L. Ed. 914, it is held that: 'Whenever one is assailed in his person or his property, there he may defend, for the liability and the right are inseparable. This is a principle of natural justice, recognized as such by the common intelligence and conscience of all nations. A sentence of the court pronounced against a party without hearing him or giving him an opportunity to be heard is not a judicial determination of his rights, and is not entitled to respect in any other tribunal. That there must be notice to the party of some kind, actual or constructive, to a valid judgment affecting his rights, is admitted. Until notice is given the court has no jurisdiction, in any case, to proceed to judgment, whatever its authority may be, by the law of its organization, over the subject-matter.' "

The opinion likewise declares:

"Certainly, nothing is gained by saying that the proceeding [the adoption proceeding] is one quasi in rem, for, in all such, notice to the party to be affected and bound, either actual or constructive, is absolutely essential. Nor is it material that the order may be set aside on petition, appeal, or certiorari. The fact still remains that as to the father the order is a mere nullity, and may be disregarded as such whenever and wherever it comes in question as against him or as affecting his rights. But the order in question may well be held valid as against the minor child. * * * The judgments and decisions of a judicial tribunal are conclusive and secure against collateral attack only when the tribunal rendering them had jurisdiction of the subject-matter and the parties to be affected by them. By reason of the want of jurisdiction of the person of the plaintiff, the proceeding in question established nothing as against him, and is no evidence that he abandoned his child."

A similar decision on this question is to be found in Lee v. Back, 30 Ind. 148.

In Matter of MacRae, 189 N. Y. 142, 81 N. E. 956, 12 Ann. Cas. 505, there is a discussion of this question, but, as I think, not strictly in point as to the precise question here at bar. There arose the question as to a second adoption of a minor child. The natural parents had consented to the first adoption, and, on the death of the foster parents, there was a second adoption without notice to the natural parents. It was held by the court by a vote of four to three of the justices that the first adoption with the consent of the natural parents had so completely extinguished their parental rights as to divest them of any further rights as to the child and thus dispense with the necessity of further notice. Such is not the case here, as there was no former valid adoption of the child.

In some of the cases above cited and discussed there will be found references as to the general powers of the state over minor children as "parens patriæ." This phrase is very illusory in its meaning, and has meant different things at different times in world history. It arose under the Roman system of jurisprudence when the rescript of the emperor was the highest law. It has been used frequently to justify the acts of absolute power when the ruler and the legal state were one and the same. No doubt Louis XIV was

the "parens patriæ" when he declared, "L'état, c'est moi." It found currency in England especially when the king assumed to rule without Parliament. And, when Parliament seized the power to rule and became "omnipotent," Parliament claimed to be "parens patriæ."

[3] But under our political system the state is not "omnipotent," and, if it be "parens patriæ," it is only so in a very restricted sense, and with due restraint as to the rights of individuals resting upon natural justice, and surrounded with the bulwarks of constitutional safeguards. While the right of the natural parents to the custody of their children is not a proprietary right in the same sense as if the child were a chattel, and while it is accompanied by a corresponding duty which arises from the relation of parent and child, it has ever been regarded, even in primitive civilizations, as one of the highest of natural rights. The state cannot interfere with this right simply to better the moral and temporal welfare of the child as against an unoffending parent. If so, then the state might transfer the handsome child of poor parents to the custody of a childless couple of wealth and moral refinement against the will of the natural parent. Of course, the state has not so attempted, but, if its rights over children are superior to those of the natural parents, then there is no legal difficulty in the way of such legislation provided a dominant public opinion may tolerate it. To hold that the state may permit its courts to determine without notice to the parent that he has forfeited his natural rights to the custody of his child is nothing less than to assert that the powers of the state over the child are in their nature legally superior to the natural rights of the parent.

It is to be regretted that the learned counsel who argued this appeal have been so reticent upon the oral arguments, and in their briefs, as to the adjudged cases in which their respective contentions have been considered heretofore, for no reference was made to any one of them.

The order of the Special Term should be reversed, with $10 costs and disbursements, and the matter is remitted to the Special Term for hearing and determination upon the questions raised by the traverse to the return.

JENKS, P. J., and THOMAS and WOODWARD, JJ., concur. HIRSCHBERG, J., votes to affirm on opinion of Mr. Justice KAPPER at Special Term.